**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**VICTOR BLAKE,**

      **Plaintiff,**

                                      **Civil Action 2:15-cv-2625**
      **v.**                              **Judge George C. Smith**
                                        **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Victor Blake, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 19), and the administrative record (ECF No. 9). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff protectively filed his application for benefits in February 2012, alleging that he has been disabled since December 1, 2004, due to HIV-positive status, a history of drug abuse, hepatitis C, and back and shoulder pain. (R. at 149-69, 188.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Thomas L. Wang ("ALJ") held a hearing on January 24,

2014, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 42–55.)  Richard

P. Oestreich, a vocational expert, also appeared and testified at the hearing.  (R. at 55-59.)  On

February 12, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the

meaning of the Social Security Act.  (R. at 18-32.)  On May 28, 2015, the Appeals Council

denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final

decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

**A.    Plaintiff's Testimony**

Plaintiff testified at the administrative hearing that he became disabled in 2004 due to his

"chronic back ailments," in addition to his HIV status and hepatitis C.  (R. at 43.)  He said he

stopped working because he could not sit down and was subsequently incarcerated.  (R. at 44.)

He testified that he "cannot really lift, pull, stand, sit so long, [or] stand so long."  (R. at 46.)

With regards to treatment, Plaintiff indicated that he had tried physical therapy, but that it

did not work and also that he had tried a friend's TENS unit and also felt that it did not work.

He further indicated that he had not received injections or underwent surgery, but that at the time

of the hearing his doctors were talking about it.  (R. at 45.)  He later added that cortisone

injections were recommended, but that he declined them because he had heard from others that

he would still have constant pain after an injection.  (R. at 48.)  Plaintiff described his pain as

located at his tailbone and as a constant, sharp-shooting pain.  (R. at 49.)  He also stated that the

pain shoots down his right leg after he sits for a certain length of time.

Plaintiff said that during a typical day, he is lying down and constantly fatigued.  He

stated that sitting makes his pain worse and that he sometimes cannot walk far, which he

2

described as more than a block or two.  (R. at 46.)  He further represented that he lies down at intervals of "possibly four hours" and takes muscle relaxants.  He added that he sits at a high chair to cook his food because he "cannot really bend over."  (*Id*.)  He has someone come to his apartment to help with his other chores.  (R. at 51-52.)  Plaintiff estimated that he could stand for 20-30 minutes.  (R. at 52.)  He also represented that it bothers him to lift ten pounds.  (R. at 52.)  Plaintiff testified that he sleeps only two hours per night due to pain and approximately three or four hours during the day.  (R. at 53.)

Plaintiff also testified that his Hepatitis C affects him from working because he is tired. He further testified that Dr. Frazier told him that once he begins treatment for hepatitis C, he will be unable to work because of the side effects of the medications.  (R. at 53.)  Plaintiff stated that since his diagnosis of hepatitis C in 2010 or 2011, he has not noticed any change in his condition.  (R. at 54.)  Plaintiff indicated that he takes daily medication for his HIV status and that he does not experience side effects from the medication.  (*Id*.)

**B.    Vocational Expert Testimony**

Richard P. Oestreich testified as the vocational expert ("VE") at the administrative hearing.  (R. at 55-59.)  The VE identified Plaintiff's past relevant employment as a cleaner, classified as a medium, unskilled job; a laborer, a medium, unskilled job; and a shipping and receiving clerk, a medium, skilled position.  (R. at 56.)

The ALJ proposed a series of hypotheticals regarding an individual with Plaintiff's age, education, and work experience and the residual functional capacity ("RFC") he ultimately assessed.  The VE testified that such an individual could perform Plaintiff's past relevant work

as a cleaner and a laborer, along with 43,000 light and medium, unskilled jobs in the state economy, with 460,000 nationally, such as a laundry worker, packager, or sorter.  (R. at 56-57.)

The VE further testified that there would be no jobs available if the hypothetical individual laid down for one hour every work day or needed four fifteen-minute breaks in addition to regularly scheduled breaks.  (R. at 58.)

### III.    MEDICAL RECORDS[1]

**A.    Ellis Frazier, M.D.**

The record contains treatment notes from primary care physician, Dr. Frazier, beginning in December 2011.  (R. at 296-97.)  On December 28, 2011, after obtaining Plaintiff's history, reviewing his past records, and performing a physical examination, Dr. Frazier assessed Plaintiff as symptomatic HIV disease, coinfection with hepatitis C and possibly hepatitis B and previous infection with hepatitis A, chronic dental disease, and substance use.  (R. at 297.)

When seen for follow-up on January 17, 2012, Plaintiff reported that he was adhering to his antiretroviral medications for HIV.  Dr. Frazier explained to Plaintiff that he was HIV and hepatitis C positive and that he would need treatment in order to prevent advanced disease.  Dr. Frazier advised him that the treatment he would need would cause some health issues that may prompt him to seek disability, which he further advised could be a twelve-month process.  Dr. Frazier's physical examination findings were mostly normal with the exception of observing that Plaintiff suffered from significant dental disease.  (R. at 294.)

---

[1]In his Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to his alleged mental impairments.  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

In February 2012, Plaintiff reported he was still 100% adherent to his antiretroviral medications.  Dr. Frazier observed that Plaintiff was in no acute distress.  Plaintiff reported that he was doing well and exercising.  Dr. Frazier noted Plaintiff was ready to graduate off his program.  (R. at 292.)

In March 2012, Dr. Frazier reported that Plaintiff was doing well and was preparing to finish his parole in good standing.  Dr. Frazier noted that Plaintiff had a fairly benign health history except for his HIV-positive status and hepatitis C.  (R. at 289.)  Dr. Frazier also noted that Plaintiff is working with Ryan White Case Management to assist him with housing and that obtaining Social Security disability benefits would also assist him with that.

In April 2012, Plaintiff reported that his eating habits had changed because he did not have access to food and that weight loss was his main health issue.  Plaintiff also reported "some back pain" for which he went to the emergency room.  (R. at 286.)  Dr. Frazier noted that Plaintiff needed to strengthen himself so that he could undergo hepatitis C treatment.  (R. at 286.)  He further noted that Plaintiff's "musculoskeletal pain is over; he does not have any problems and is not requesting any further medication."  (R. at 287.)

In May 2012, Dr. Frazier noted that Plaintiff was in no acute distress.  Plaintiff reported that he was sexually active.  (R. at 283.)

In July 2012, Plaintiff complained of ongoing back pain for which he was taking antispasmodics.  Plaintiff again reported that he was sexually active.  He also indicated that he wanted to proceed with hepatitis C treatment.  On examination, Plaintiff had pain with range-of-motion testing, but no other musculoskeletal or extremity abnormalities were noted.  (R. at 280.)

In September 2012, Plaintiff reported that he was stable, that he had not intentionally missed any doses of medication, and that he had been walking and exercising.  Plaintiff also reported that he was experiencing erectile dysfunction, anxiety about getting the hepatitis C treatment started, and the fact that he could not eat secondary to a dental extractions.  (R. at 277-78.)  Dr. Frazier indicated that, "[w]e will support the fact that [Plaintiff] will be quite ill and not able to work, therefore the patient is considered disabled from work, and provide much needed support for him."  (R. at 278.)

In November 2012, Plaintiff reported some general aches and pains related to his hepatitis C status and some generalized fatigue.  He indicated that he remained sexually active.  (R. at 335.)

In February 2013, Plaintiff reported that he was adherent to his medication regimen.  He indicated that all he does is eat and watch TV.  He again reported that he was sexually active.  (R. at 333.)

In April 2013, Plaintiff reported some episodic back pain.  Dr. Frazier noted that Plaintiff was "switching positions back and forth."  Plaintiff also reported significant fatigue that prevented him from doing some activities and exercise.  Plaintiff further indicated that he was "episodically sexually active."  (R. at 331.)  On examination, Dr. Frazier found lumbar paravertebral muscular tenderness, but straight-leg raise testing was negative.  Dr. Frazier noted that Plaintiff displayed had no symptoms of sciatica.  Dr. Frazier added that Plaintiff "jumped and winced."  (R. at 331-32.)

On June 25, 2013, Plaintiff complained of increased back pain and also that his "knees give out."  (R. at 328.)  Plaintiff also reported that he could not stand for 5-10 minutes, that he

could not bend, that he needs frequent breaks, and that the only time he does not have any pain is when he is lying down and trying to sleep.  Plaintiff described his pain as "8/10 in intensity." (*Id*.)  Dr. Frazier observed that Plaintiff seemed to move and fidget, but that he was otherwise in no acute distress.  (R. at 329.)  On examination, Dr. Frazier found some lumbar and paravertebral muscle tenderness, muscular rigidity, and decreased strength as he lifted his legs, but Plaintiff's straight-leg raise testing was negative.  (*Id*.)

On July 22, 2013, Dr. Frazier completed a physical residual functional capacity assessment in which he opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk less than two hours; and sit less than thirty minutes per eight-hour workday.  (R. at 412.)  Dr. Frazier also opined that Plaintiff must lie down four times during a workday.  (*Id*.)  Dr. Frazier noted that he based his opinion on fatigue related Plaintiff's HIV and hepatitis C.  (R. at 413.)  Dr. Frazier opined Plaintiff could never climb ladders, but could occasionally twist, stoop, crouch, or climb stairs; and he must avoid all exposures to extreme cold/hot, wetness, humidity, fumes and heights.  (R. at 413-14.)  Dr. Frazier believed that Plaintiff could perform a job within these restrictions only 0-3 days per week, and less than 3 consecutive weeks per month. (R. at 414.)  Dr. Frazier concluded that the limitations have applied to Plaintiff since December 28, 2011.  (*Id*.)

An x-ray of Plaintiff's lumbar spine taken on July 31, 2013, revealed normal findings. (R. at 385.)

On August 18, 2013, following a telephone conversation with Plaintiff, Dr. Frazier noted that Plaintiff reported significant pain in his back and requested pain medications.  Dr. Frazier noted that Plaintiff's x-rays of his lumbar spine were negative.  Dr. Frazier declined to prescribe

stronger pain medication and recommended that Plaintiff go to the emergency department to document his problem and for further evaluation if he continued to experience significant pain. (R. at 327.)

A second x-ray of Plaintiff's lumbar spine, taken on September 17, 2013, did not reveal any abnormalities.  (R. at 386.)

**B.      AIDS Resource Center Ohio/Elizabeth Weinstock, M.D.**

Plaintiff was seen by Dr. Weinstock on September 18, 2013, to establish care.  (R. at 407-11.)  Plaintiff reported chronic, non-radiating low-back pain, with intermittent left-leg weakness without paresthesia.  (R. at 409.)  Upon examination, Dr. Weinstock noted that Plaintiff reported tenderness to palpation in his lumbar paraspinal muscles.  (R. at 410.)  She also found that Plaintiff displayed normal forward bend and appropriate and equal bilateral upper and lower extremity muscle strength.  (*Id*.)  Dr. Weinstock referred Plaintiff to pain management for his back and advised that she would not prescribe narcotic medications.  She also offered Plaintiff a prescription for physical therapy.  (R. at 411.)

Plaintiff saw Dr. Weinstock on November 15, 2013, to follow-up on his complaints of lower back pain.  Plaintiff reported that he was completing a course of physical therapy.  (R. at 403.)  Dr. Weinstock observed that Plaintiff was in no acute distress.  (R. at 405.)  Upon examination, Dr. Weinstock again found tenderness to palpation in Plaintiff's lumbar paraspinal muscles and that Plaintiff displayed normal forward bend and appropriate and equal bilateral upper and lower extremity muscle strength.  (R. at  406.)  Dr. Weinstock assessed HIV, hepatitis C, and chronic intermittent low back pain.  (*Id.*)  She indicated that Plaintiff was to complete his physical therapy and undergo an MRI.  She continued his medication of Tramadol.

8

In December 2013, Plaintiff reported ongoing pain without much relief on Tramadol.  (R. at 398.)  Dr. Weinstock noted that Plaintiff's MRI showed degenerative changes.  She observed that Plaintiff was in no acute distress.  (R. at 400.)  Plaintiff reported that percocets help him, but Dr. Weinstock "re-iterated that [she] does not want to [prescribe] narcotics."  (R. at 401.)  She indicated that Plaintiff was to follow-up with Dr. Karas to assess whether he needed spinal surgery and to consider a TENS unit.  (*Id.*)

## C.  Ohio Health Physical Therapy

Plaintiff attended physical therapy for a few weeks in October and November 2013.  (R. at 415-30.)  Plaintiff reported a 20-year history of back pain.  (R. at 415, 428.)  He reported that he lived alone in a second floor apartment.  (R. at 428.)  The discharge report indicated no significant change in pain levels or functional status over the course of treatment.  (R. at 415.)

## D.  Ohio Health Neurological Physicians: Michael J. Meagher, M.D. /Chris Karas, M.D.

Plaintiff consulted with Dr. Meagher on November 15, 2013.  Plaintiff reported low back pain radiating into the bilateral lower extremities.  On examination, Dr. Meagher found mild weakness with a single leg squat on the left compared to the right.  He noted that Plaintiff's reflexes were greatly diminished throughout, and that straight leg raising was positive on the left, but negative on the right.  He further noted that the remainder of his examination was unremarkable.  He arranged for a lumbar MRI.  (R. at 392-93.)

On November 21, 2013, an MRI of Plaintiff's lumbar spine showed endplate changes and disc space narrowing at L5-S1, which was most likely degenerative in nature but could also be due to infection.  All other findings were normal.  (R. at 387-89.)

9

On December 3, 2016, in correspondence to Dr. Weinstock, Dr. Meagher wrote that Plaintiff's had what appeared to be "fairly severe Modic endplate changes and edema in the endplates of [his] vertebra." (R. at 389.) He acknowledged that the radiologist raised the question about whether this was attributable to a possible infection with his history of HIV, but added that he thought this was less likely. He further noted that Plaintiff has "severe disk degenerative changes and has . . . fairly severe foraminal narrowing bilaterally which is most certainly worse when he stands and walks because it further loads the disk and the foramen becomes narrower." (R. at 389.) He opined that Plaintiff may "ultimately . . . require surgical intervention, which will probably involve a diskectomy, foraminotomy, and a fusion." (*Id.*) Dr. Meagher also reported that he would be obtaining laboratory work to assess whether Plaintiff had an infection. He added that because he no longer operates, he would be referring Plaintiff for an appointment with Dr. Karas. He concluded that he "believe[d] that [Plaintiff's] disk degenerative changes are chronic and are disabling and [indicated that he] will support a disability application." (R. at 390.)

Plaintiff saw Dr. Karas, a neurosurgeon, on December 23, 2013, for a surgical consultation. Dr. Karas noted that Plaintiff had tried medications and physical therapy, but that he had "refused thus far any interventional pain management." (R. at 436.) Examination revealed full strength in both legs and arms, no muscle spasm or Hoffman's sign, and positive straight-leg raise testing on the left. Plaintiff informed Dr. Karas that "he does not wish to pursue surgical intervention" and "does not wish to pursue any interventional pain management." (*Id.*) Dr. Karas referred Plaintiff for a spine and sport evaluation for conservative management. (R. at 436.)

E.     **Gregory Figg, M.D.**

Plaintiff saw Dr. Figg, a pain specialist, on December 5, 2013.  On examination, Dr. Figg noted that Plaintiff had significant pain in his lumbar spine, exacerbated by extension and flexion.  Plaintiff exhibited a positive straight-leg test on the right, but his reflexes remained symmetrical.  Dr. Figg futher indicated that Plaintiff's strength was intact and that he could walk on his toes and on his heels.  Plaintiff also had a negative Romberg sign.  Dr. Figg assessed a history of HIV and chronic low back pain and noted that Plaintiff has "significant disc disease and modic end plate changes at L5-S1."  Dr. Figg opined that, "[u]ltimately it would be difficult to believe that [Plaintiff] will do very well with conservative management based on the severity of these changes."  (R. at 432.)  He therefore referred Plaintiff to Dr. Karas to assess whether the surgical intervention is indicated.  Dr. Figg noted that he offered injection therapy, but that Plaintiff was not interested.  Dr. Figg prescribed a nonsteroidal anti-inflammatory drug, a muscle relaxant, and an antidepressant used for nerve pain.  (R. at 432-33.)

F.     **Phillip Swedberg, M.D.**

Dr. Swedberg performed a consultative examination of Plaintiff for disability purposes on June 1, 2012.  (R. at 259-67.)  Plaintiff complained that he tired easily.  Plaintiff reported that he was diagnosed with HIV in 1994 and took Truvada, Prezista, and Norvir.  He further reported that his treatment had been going well and that he was compliant with medication.  He had received no treatment for hepatitis C.  Plaintiff reported that he does his own laundry, dishes, and other activities of daily living.  (R. at 259.)

On examination, Dr. Swedberg observed that Plaintiff ambulated with a normal gait without the use of ambulatory aids.  On neurological examination, Dr. Swedberg found that

11

Plaintiff displayed no evidence of muscle weakness or atrophy and that all of his sensory modalities were well-preserved, including light touch and pinprick.  He also observed that Plaintiff was comfortable in both the sitting and supine positions.  (R. at 260.)

Dr. Swedberg assessed a normal physical examination, HIV-positive treated with antiretroviral therapy, and hepatitis C untreated.  (R. at 261.)  He noted that Plaintiff was able to forward bend without difficulty and that his range of motion was completely normal.  X-rays of Plaintiff's lumbar spine showed no significant disc narrowing but slight degenerative spurring. (R. at 263.)  Dr. Swedberg opined that Plaintiff was capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects and that Plaintiff had no difficulty reaching, grasping, and handling objects.  (R. at 261.)

## G.      State-Agency Evaluation

On June 18, 2012, state-agency medical consultant, Steve McKee, M.D., reviewed the record to assess Plaintiff's physical functioning capacity and determined that Plaintiff's physical impairments were not severe.  (R. at 71.)

On November 19, 2012 , state-agency physician, Leigh Thomas, M.D., reviewed the record upon reconsideration and affirmed Dr. McKee's assessment.  (R. at 84.)

## IV.    ADMINISTRATIVE DECISION

On February 12, 2014, the ALJ issued his decision.  (R. at 21–32.)  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since February 3, 2012, the application date.  (R. at 23.)  The ALJ found that

Plaintiff had the following severe impairments: hepatitis C, degenerative disc disease at L5-S1,

an adjustment disorder with mixed anxiety and depression, and cocaine abuse in early full

remission.  (Id.)  He further found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (Id.)  At step four of the sequential process, the ALJ set forth

Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that [Plaintiff] has
> the residual functional capacity to perform medium work as defined in 20 CFR
> 416.967(c).  Mentally, he can perform work without an assembly line or strict

---

[2]Social Security Regulations require ALJs to resolve a disability claim through a five-
step sequential evaluation of the evidence.  See 20 C.F.R. § 416.920(a)(4).  Although a
dispositive finding at any step terminates the ALJ's review, see Colvin v. Barnhart, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or
      equal the criteria of an impairment set forth in the Commissioner's Listing of
      Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant
      perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual
      functional capacity, can the claimant perform other work available in the national
      economy?

See 20 C.F.R. § 416.920(a)(4); see also Henley v. Astrue, 573 F.3d 263, 264 (6th Cir. 2009);
Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001).

production quotas, in a setting that permits him to be off task up to 5% of the workday and that requires occasional interaction with the public, co-workers, or supervisors. He can perform low stress work, defined as requiring only occasional changes in the work setting. Due to his hepatitis C, he is precluded from work involving food preparation or food serving.

(R. at 26-27.) The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms to be not fully credible. (R. at 27.) The ALJ assigned "little weight" to the opinion of Dr. Frazier, finding "it is inconsistent with the objective evidence, and is inconsistent with the doctor's own reported clinical findings." (R. at 29.) The ALJ assigned "great weight" to Dr. Swedberg's consultative opinion, finding his assessment to be consistent with the greater weight of the objective evidence, supported by his own clinical findings, and not contradicted by another credible, persuasive opinion source." (R. at 30.) The ALJ gave "little weight" to the assessments of Dr. McKee and Dr. Thomas, "who opined that Plaintiff had no severe physical impairments, explaining that they "only considered evidence in the record at the time of the reconsideration determination; however, evidence received at the hearing level demonstrates that [Plaintiff] is more limited than assessed by those experts." (R. at 30.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff is able to perform his past relevant work as a cleaner and a laborer, as well as other jobs that exist in significant numbers in the national economy. (R. at 30-32.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 32.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

 Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.    ANALYSIS

 In his Statement of Errors, Plaintiff advances two contentions of error.  More specifically,

Plaintiff challenges the weight the ALJ assigned to the opinion of consultative examiner Dr.

Swedberg, asserting that the opinion was outdated and failed to consider his lumbar spine

impairment.  Plaintiff also maintains that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ relied upon premises that "are flawed and inconsistent with the record."  (Pl.'s Statement of Errors 9–10, ECF No. 14.)  The Undersigned addresses each of these contentions of error in turn.

### A.        Assessment of Dr. Swedberg's Opinion

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c); *see also* SSR 96–8p 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.").  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must apply the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source.  In addition, the regulations provide that where, as here, the ALJ does not assign controlling weight to the claimant's treating physician, he or she must explain the weight assigned to the opinions of the medical sources:

> Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. § 416.927(e)(2)(ii).  Where an ALJ's opinion satisfies the goal of § 416.927 and is otherwise supported by substantial evidence, the failure to explicitly provide the weight assigned is harmless.  *See, e.g.*, *Pasco v. Comm'r of Soc. Sec.,* 137 F. App'x 828, 839 (6th Cir. 2005) (harmless error where the ALJ failed to mention or weigh the report of consultative neurologist who only evaluated plaintiff once and was not a treating source); *Dykes v. Barnhart*, 112 F. App'x 463, 467–69 (6th Cir. 2004) (failure to discuss or weigh opinion of consultative examiner was harmless error); *cf. Friend v. Comm'r of Soc. Sec*., 375 F. App'x 543, 551 (6th Cir. 2010) (explaining that the treating physician rule "is not a procrustean bed, requiring an arbitrary conformity at all times.  If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

Here, as discussed above, the ALJ assigned "great weight" to the June 2012 opinion of consultative examiner Dr. Swedberg, asserting that his assessment was "consistent with the greater weight of the objective evidence," supported by Dr. Swedberg's own clinical findings, and was "not contradicted by another credible, persuasive opinion source."  (R. at 30.)  Plaintiff maintains that the ALJ erred in relying upon Dr. Swedberg's opinion because it is old evidence because it pre-dates Plaintiff's complaints of low-back pain and other significant evidence that informs his back pain.  Plaintiff further argues that the ALJ erroneously relied upon Dr. Swedberg's opinion because the report fails to consider Plaintiff's lumbar spine impairment.

The Undersigned finds Plaintiff's first critique of the ALJ's assignment of "great weight" of to the opinion Dr. Swedberg unavailing.  The Court rejects Plaintiff's conclusion that Dr. Swedberg's June 2012 opinion is temporally irrelevant for several reasons.  First, the

examination occurred four months *after* Plaintiff filed an application for disability benefits and more than seven years after his alleged onset date.

Second, contrary to Plaintiff's assertions, the examination did not "pre-date[] [Plaintiff's] complaints of low back pain," (Pl.'s Statement of Errors 14, ECF No. 14).  Rather, the record reflects that Plaintiff alleged a history of chronic back pain that started before his alleged December 2004 onset date.  (*See, e.g.*, R. at 42–43 (testifying that he began experiencing chronic back ailments even before his December 2004 alleged onset date); R. at 44 (testifying that he stopped working prior to his incarceration due to his inability to sit down); R. at 428 (informing his physical therapist in October 2013 that he had a twenty-year history of low-back pain and that his "[s]ymptoms [remained] unchanged over time").)  Moreover, Plaintiff specifically complained of low-back pain to Dr. Frazier in April 2012 and again in July 2012.  (R. at 280, 286).  He also complained of back pain in an April 2012 adult function report, alleging that "his back hurts if he stands more than about 10 minutes."  (R. at 219, 221.)  Perhaps most significantly, when asked by his counsel at the January 24, 2014 administrative hearing when his low-back pain became as severe as he was alleging at the time of the hearing, Plaintiff testified that "it's been like maybe excruciating [for] three years now."  (R. at 50–51.)  In other words, Plaintiff testified that he had been experiencing "excruciating" pain symptoms at the level of severity described in 2014 since approximately January 2011, which is more than a year prior to when Dr. Swedberg examined Plaintiff.

Finally, although Plaintiff is correct that the record contains evidence that "informs his physical condition" that was generated after Dr. Swedberg's opinion, such a finding does not require the conclusion that Dr. Swedberg's opinion cannot be credited where the ALJ has

18

considered the subsequent medical evidence.  *See, e.g.*, *McGrew v. Comm'r of Soc. Sec.*, 343 F.

App'x 26, 32 (6th Cir. 2009) (ALJ did not improperly rely upon state-agency physicians'

opinions where they were out of date where it was clear ALJ considered the medical

examinations that occurred after the opinions were rendered and takes into account any

changes); *Ruby v. Colvin*, No. 2:13–CV–01254, 2015 WL 1000672, at *4 (S.D. Ohio Mar. 5,

2015) ("[S]o long as an ALJ considers additional evidence occurring after a state agency

physician's opinion, he has not abused his discretion.").  Here, the ALJ reviewed and considered

the normal July 2013 and September 2013 x-ray findings, as well as the November 2013 MRI

findings.  (*See* R. at 29 (discussing Plaintiff's normal x-ray findings); R. at 24 (noting that the

"MRI evidence demonstrates only disc bulge and osteophyte at L5-S1, with no evidence or nerve

root or spinal cord compromise").)  The ALJ further considered Plaintiff subsequent treatment

and his reports of his activities of daily living.  (R. at 25–28.)  The fact that the ALJ took into

account evidence generated after Dr. Swedberg's opinions is confirmed by his conclusion that

Plaintiff suffered from the severe impairment of degenerative disc disease at L5-S1 and also his

assessment of functional limitations beyond those Dr. Swedberg opined.

Plaintiff's second critique of the ALJ's assignment of weight to Dr. Swedberg's opinion,

that Dr. Swedberg did not consider his lumbar spine impairment, is equally unavailing.  Review

of Dr. Swedberg's examination notes reflect that Plaintiff failed to identify back pain as a

complaint.  (R. at 259.)  Thus, to the extent Dr. Swedberg did not explicitly state that he was

evaluating such an impairment, it was Plaintiff's fault, not Dr. Swedberg's.  Nevertheless, Dr.

Swedberg conducted a thorough physical examination, which included taking multiple flexion

measurements of Plaintiff's spine; assessing his muscle and grasp strength, his ability to bend,

19

the curvature of his spine, and his ability to stand on either leg; testing for paravertebral muscle spasm and tenderness; conducting straight-leg testing; taking flexion measurements of his hips and knees; and testing for muscle weakness and atrophy, among several other tests.  (R. at 260–61.)  Dr. Swedberg also observed that Plaintiff was able to ambulate with out difficulty and was comfortable in both the sitting and supine positions.  Plaintiff fails to identify what additional tests Dr. Swedberg should have performed that would have better assisted the ALJ in assessing the severity of his back impairment or to otherwise explain why Dr. Swedberg's objecting testing results are invalid.

In sum, the Undersigned finds that the ALJ properly considered and reasonably assessed Dr. Swedberg's June 2012 opinion.  Accordingly, it is **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

**B.      RFC/Credibility Assessment**

In his second contention of error, Plaintiff asserts that substantial evidence does not support the ALJ's RFC assessment.  A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

Although Plaintiff describes this contention of error as a challenge to the ALJ's RFC determination, a review of the more specific challenges he advances reflects that this contention of error is more properly characterized as challenging the ALJ's credibility assessment:

> In finding that Mr. Blake was non-credible, and in finding that he was not *more* restricted than the RFC outlined above, the ALJ relied on 5 premises: (1) Mr. Blake refused surgery and interventional pain management (i.e., injections), (2) Mr. Blake does not use a TENs unit, (3) physical therapy notes indicate reduction of pain to 1/10, with no pain with home activities of daily living, (4) the consultative examiner's physical exam and report indicated normal findings, and (5) Mr. Blake's activities of daily living were not consistent with further restriction. (Tr. P. 27-28). As will be explained below, all 5 of these premises are flawed and inconsistent with the record. As such, it must be found that the RFC as a whole is not supported by substantial evidence.

(Pl.'s Statement of Errors 9–10, ECF No. 14.)

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew,

resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  This

deference extends to an ALJ's credibility determinations "with respect to [a claimant's]

subjective complaints of pain."  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)

(quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)).  Despite

this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial

evidence."  *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be

"based on a consideration of the entire record."  *Rogers*, 486 F.3d at 247 (internal quotation

omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific

to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave

to the individual's statements and the reasons for that weight."  *Id.* at 248; *see also Mason v.

Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29,

2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at

248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds

contradictions among the medical reports, claimant's testimony, and other evidence."  *Walters*,

127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in

evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of

medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996

WL 374186 (July 2, 1996)[3]; *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted). The Sixth Circuit has held that "even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).

Here, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptom were not fully credible. In reaching this conclusion, the ALJ discussed Plaintiff's x-ray and MRI findings, examination testing results performed by treating and examining sources, Plaintiff's conservative treatment history and refusal of pain injections, his treatment records, the findings and opinions in the record, and Plaintiff's activities of daily living. (R. at 26–30.) Review of the ALJ's detailed discussion regarding his credibility assessment reflects that he properly considered the requisite factors and that substantial evidence supports his assessment.

---

[3]SSR 16-3p, which became effective March 28, 2016, superceded and rescinded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1119029, at *1. Because SSR 16-3p does not include explicit language to the contrary, it is not to be applied retroactively. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Combs v. Comm'r of Soc. Sec*., 459 F.3d 640, 642 (6th Cir. 2006) ("The Act does not generally give the SSA the power to promulgate retroactive regulations."); *Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 541–42 (6th Cir. 2007) (declining to retroactively apply a newly effective Social Security Ruling in the absence of language reflecting the Administration's intent to apply it retroactively).

Contrary to Plaintiff's assertions, the ALJ reasonably discounted his allegations of disabling back pain based upon his conservative treatment history, refusal of spinal injections, and refusal to consider surgery. *See* SSR 96–7p, 1996 WL 374186 (July 2, 1996) (in assessing credibility, the adjudicator must consider, among other factors, "[t]reatment, other than medication, the individual receives or has received"); 20 C.F.R. § 404.1529(c)(3) (same). Indeed, the Sixth Circuit has consistently found that conservative treatment undermines a claim of disability. *See, e.g.*, *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (concluding that ALJ reasonably discounted a doctor's opined limitations where, among other things, the claimant was receiving conservative treatment); *Curler v. Comm'r*, 561 F. App'x 464, 473, 475 (6th Cir. 2014) (finding that "[h]ad [the claimant] suffered from severe pain associated with her back condition, the medical records would have revealed . . . recommendations for more aggressive treatment" where the claimant's treatment for her back condition included prescriptions for hydrocodone, tramadol, and vicodin); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) ("The ALJ's finding [that the claimant has the physical RFC for the full range of light work] is supported by the evidence in the record that his treatment was minimal and conservative during the period at question . . . ."); *McKenzie v. Comm'r*, No. 99–3400, 2000 WL 687680, at *4 (6th Cir. May 19, 2000) (concluding the ALJ's credibility finding relating to the claimant's allegations of pain was supported by substantial evidence, explaining that the claimant's "history of conservative treatment for his alleged disabling pain" is "probative evidence" that he was not disabled and "undermined" his allegations concerning the severity of his pain); *see also Sadler v. Comm'r*, No. 1:12-cv-1263, 2014 WL 642235, at *8 (W.D. Mich. Feb. 19, 2014) (collecting cases establishing that "an ALJ may discount the

24

claimant's credibility if the claimant received only a mild or conservative course of treatment for an alleged disabling impairment").  Significantly, Plaintiff does not challenge the ALJ's conclusion that Plaintiff opted only for conservative treatment, but instead contends that his refusal of more aggressive was reasonable in light of his fears and what he had heard from other individuals who received injections.  But that Plaintiff offered testimony regarding his fears about more aggressive treatment does not bar the ALJ from considering the treatments and interventions he was offered and/or underwent in connection with assessing the credibility of allegations of disabling pain.  In sum, the ALJ did not err in his consideration of Plaintiff's treatment in connection with his credibility assessment.

The ALJ also reasonably discounted Plaintiff's credibility allegations of disabling pain upon his activities of daily living.  *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain."); *Walters*, 127 F.3d at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.").  According to Plaintiff, the ALJ should not have relied upon the activities of daily living Plaintiff identified in connection with his consultative examination with Dr. Swedberg, but instead should have accepted his hearing testimony, which he maintains reflects "a severely eroded ability to perform activities of daily living."  (Pl.'s Statement of Errors 12, ECF No. 14.)  As discussed above, the Undersigned finds that the ALJ did not err in relying in part upon Dr. Swedberg's report. Regardless, review of the ALJ's decision reflects that identifying that nature and scope of

25

Plaintiff's activities of daily living he also relied upon Plaintiff's testimony, his own statements concerning his activities of daily living provided in an Adult Function Report, the report of consulting examiner Dr. Tanley, his mental health treatment records from Scioto Paint Valley Mental Health Center, his treatment records from his physical therapy, and his treatment records with his primary care physician. (R. at 24–28.) In sum, the ALJ did not err in his consideration of Plaintiff's activities of daily living in connection with his credibility assessment.

The ALJ likewise committed no reversible error in discussing Plaintiff's treatment notes from his physical therapy. Plaintiff faults the ALJ for pointing out that one of the treatment notes reflects that when performing a certain exercise, he is able to lower his back pain from 2-3/10 to 1/10, asserting that the ALJ also should have considered that he complained of pain that he rated at 7/10 when cooking and cleaning. But contrary to Plaintiff's apparent contentions, the ALJ is not required to discuss every piece of evidence within his decision, and there is no evidence that the ALJ did not consider the treatment notes in their entirety. Plaintiff also challenges the ALJ's reference to a notation in another physical therapy treatment note in which Plaintiff reported that he "[h]as no pain at home with everyday ADL's," (R. at 425), contending that this statement referred only to knee pain, not back pain, and thus it was improper for the ALJ to rely upon the notation. (Pl.'s Statement of Errors 11, ECF No. 14.) The Undersigned agrees, that read in context, it appears that the therapist was referencing Plaintiff's subjective reports concerning the severity of his knee pain. But this *de minimus* error does not otherwise deprive the ALJ's credibility and RFC assessment of substantial evidence. These determinations were premised upon a number of factors, most of which Plaintiff does not even challenge. *See Johnson*, 535 F. App'x at 507 (credibility determination based on partially invalid reasons

amounts to harmless error so long as substantial evidence remains to support the determination).

In sum, the Undersigned finds that the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record and is supported by substantial evidence. Accordingly, applying the applicable deferential standard of review, the Undersigned concludes that the ALJ's credibility determination was not erroneous. It is therefore **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED.**

## VII. CONCLUSION

From a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, he or she may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex*

*Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 11, 2016          _____/s/ *Elizabeth A. Preston Deavers*_____
         ELIZABETH A. PRESTON DEAVERS
         UNITED STATES MAGISTRATE JUDGE